UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------
In re

     DOMMER CONSTRUCTION CORPORATION        Case No. 10-12764 K

                         Debtor
-----------------------------------------------------------------


**AMENDED** OPINION AND ORDER

INTRODUCTION

        Most (if not all) states provide a comprehensive means of assuring that money paid

or loaned to improve land finds its way first to suppliers of labor or materials that are

incorporated into the improvements. In New York, that is the "Lien Law," which imposes a

statutory trust on the money, for the benefit of such suppliers.

        But New York Lien Law recognizes that some contractors or subcontractors may

have to borrow in order to perform the contract. Because a lender to a contractor cannot lien the

building <u>contractually</u> (as it is not in privity with the landowner), and because only the suppliers

themselves may lien the building <u>statutorily</u>, lending to contractors is done by "factors." Factors

loan on the security of the payments the contractor will receive during the progress of the

improvement project.

        When factors are not involved, but a construction loan secured by a mortgage <u>is</u>

involved, the Lien Law imposes filing requirements such that a possible supplier of labor or

materials may assess the chances of getting paid, and the likely timing of payments (based on the

schedule of advances on the loan), so that a decision can be made as to whether to supply labor or

materials on credit.

When a factor is involved, other filing requirements are imposed for the same purpose. If a factor does everything correctly, it can "prime" a supplier. Therefore, notice of the terms of the factoring arrangement might be critical to a possible supplier's decision whether to get involved in the project or not.

This issue extends itself throughout the ladder of subcontracts, sub-subcontracts, etc.

The Debtor here is a contractor which, in engaging a "sub," knew that the sub was borrowing from a factor, and knew that it (the Debtor) must ordinarily make its progress payments for the sub to the factor, not the sub.

In the midst of construction, the Debtor learned that not all of the sub's suppliers were getting paid in full and on-time. In order to avoid economic injury under its own obligations, it may have disregarded its obligation to the factor,[1] and paid its sub's suppliers directly, jumping over the factor. At some point (seemingly after the payments) it was learned that the factor had not properly filed its agreement under the Lien Law.

After the project was completed, and with the Debtor facing the imminent entry of a state court judgment in favor of the factor for the full amount of what the Debtor owed to the sub, with no offsets for amounts paid directly to the sub's suppliers, the Debtor/contractor filed here for relief under Chapter 11, and the factor has filed a Proof of Claim for that full amount,

---

[1]Whether it actually had such obligation is still undecided, as discussed below.

without offsets, supported solely by state court decisions that might otherwise have become "final judgments" that would bind this Court under *Kelleran v. Andrejevic*, 825 F.2d 692 (2d Cir. 1987).

This Objection to Claim followed. After much oral argument, the parties stipulated that this Court is not bound by the non-final decisions of the state court, but would give "great deference" to that court's findings of fact, so that this Court would not "re-try" evidentiary matters decided by the state court, and would order evidentiary hearing only as to matters as to which this Court believes that the state court should have heard evidence, but refused to hear it.

And so the issue presented is a <u>bankruptcy</u> issue only. Has the Rule 3001(f) presumption of validity and amount of a Proof of Claim successfully been rebutted? This Court rules that the presumption has so been rebutted, and that the Proof of Claim must be amended, without prejudice to an appeal of this Decision at an appropriate time.

This Court goes further by instructing the factor as to the appropriate elements of its amended Proof of Claim. Offsets in favor of the Debtor are indeed available, and the burden falls upon the factor to file a claim that no longer relies upon the non-final state court decisions.

It is a heavy burden indeed, because it may depend, in significant part, on many evidentiary matters that have never even been the subject of discovery, let alone trial. For example: Which suppliers to the sub actually knew about the factoring arrangement despite the failure to properly file it? As to each such sub-sub who did know, did the knowledge come before or after a decision by the sub-sub to provide labor or materials? Is a certain non-binding decision of a lower state court decision persuasive to this Court?

Because this Court now rules, with great respect for the state court judge in this difficult case, that the state court's decision was incorrect, the factor must amend its claim downwards, without prejudice to its right eventually to appeal.

PROCEDURAL POSTURE

The procedural posture of this case is somewhat unusual. This matter was litigated in state court and was the subject of two decisions written by the state court judge. But the Debtor filed its Chapter 11 Petition before a final judgment could be entered. The state court had ruled against the Debtor in an amount over $400,000. However, after the Petition was filed, the Debtor made a strategic decision to permit the judgment to be entered so that it could appeal it through the state court system. When the prevailing party failed to move for relief from the stay to enter the judgment, the Debtor itself moved for lift of stay to permit the judgment to be entered against it, so that it could appeal the judgment.

At hearing on that motion, this Court advised the parties that it would be willing to hear the matter in the context of a claims objection, and in an effort to avoid having to fully re-litigate the matter, would give "great deference" to the state court's Findings of Fact and would rule *de novo* on disputes regarding the law. The parties then stipulated to this Court's denial of the Debtor's Motion to Lift Stay.

The prevailing party in the state court, BFG, Inc., filed its Proof of Claim. The Debtor filed its objection to the claim. The Court then directed the parties to "annotate" the state court's decisions from each side's perspective. From the Debtor's perspective, that meant, of

course, pointing out those parts of the state court's decisions that the Debtor felt constituted

error, with an explanation of the Debtor's arguments in that regard.  From BFG's perspective, of

course, it meant simply explaining why it agreed with the state court's rulings, together with any

points that BFG wished to make in support of the various rulings made by the state court, which

the state court might have included in its decisions, but did not.

After appropriate exchanges and submissions, the matter came before this Court

for oral argument on January 21, 2011.  At the close of oral argument, this Court took the matter

under submission.

In sum, then, this Court deems the procedural posture of the matter to be this:

Claimant BFG, Inc. filed a Proof of Claim in the amount of $438,725.17, supported by the entire

record of the state court proceeding and the rulings by the state court judge which never took the

form of a final judgment; this Court will review the state court's Conclusions of Law *de novo* and

will give "great deference" to the state court's Findings of Fact except to the extent that the state

court's findings of "mixed fact and law" were premised on an incorrect interpretation of law; the

matter will not be re-litigated here, except that evidence may be reopened and heard here if this

Court determines that an error of law within the state court decisions compels a fuller evidentiary

record.[2]

---

[2]Though it might appear that this Court is purporting to sit "in review" of the state court decisions, that is not a correct interpretation.  Rather, it would be fully within the authority of this Court to disregard the state court proceedings entirely, since they never resulted in a Final Judgment.  In that event, a full evidentiary record would have to be made here, which would be wasteful for the parties.  Hence, this Court is attempting to derive as much guidance as possible from the state court record and the state court's rulings, as this Court attempts to reach the same conclusion it would reach if the state court proceedings were ignored entirely, and the matter fully retried here in the context of this claims objection.

## ISSUE PRESENTED

The issue presented here is uniquely a bankruptcy issue.  In the state court the issue was whether, under general principles of contract law, common law and under particular New York Statutes appertaining to the commercial construction industry, claimant BFG was damaged when the Debtor construction company chose to dishonor $292,000 worth of assignments that the Debtor's subcontractor, MBE, had made to the claimant, and instead made those payments directly to unpaid suppliers of labor or materials to MBE, which suppliers could otherwise have placed liens on particular projects.

In this Court the question is how a claimant must support a Proof of Claim in this regard, once the non-binding state court decision on the matter has been determined to fail as such support.

## FACTUAL BACKGROUND

The Debtor is a small company.  Paul Dommer is its principal.

At some point prior to December 5, 2003, the Buffalo Public School System decided to renovate eight Buffalo Public Schools.  It named Louis P. Ciminelli Management Company, Inc. to be the "Program Provider" (i.e., general contractor) for this effort.  On September 17, 2003, Ciminelli chose the Debtor, Dommer Construction Corporation, to be the "primary subcontractor" with regard to work on two of the schools.  The dollar amount of that subcontract was $1,884,000.

Under Article 16 of that subcontract, Dommer was required to provide a performance bond and a labor and material payment bond in that total amount, and Dommer did so. (This was also required by statute because this was a "public improvement" project.)

In December of 2003, Dommer chose the MBE Group, Inc. to perform $1.4 million of the work (much of which involved studding and drywall work).

In the sub-subcontract between Dommer and MBE, Dommer reserved "the right to withhold and to recover any and all amounts necessary to cover costs that may be incurred by [Dommer] as a result of [MBE's] unsatisfactory job progress, including costs associated with supplementation of [MBE's] work forces; defective construction not remedied; disputed work; third-party claims filed or reasonable evidence that such claims may be filed; failure of [MBE] to make timely payments for labor, equipment, and materials, reasonable evidence that the [sub subcontract] cannot be completed for the unpaid balance of the [sub subcontract] amount and retainage."

Such language was not gratuitous. New York Lien Law § 70 imposes a statutory trust on any payments that a contractor or subcontractor receives on a job, in favor of suppliers of labor or materials on the contract. Moreover, a condition of the statutorily required payment bond was that Dommer "shall promptly make payment to all claimants . . . for all labor and material used or reasonably required for use in the performance of the subcontract," and defined "claimant" to be "any contractor, supplier, materialman or worker providing labor, materials, or both, used or reasonably required for use in the performance of the subcontract."

Based on substantial judicial experience, this Court takes judicial notice of the fact that to the extent that the bonding company had to pay any such claimant under the bond, the bonding company had a right of indemnification from Dommer.

MBE needed to borrow money in order to be able to perform its sub-subcontract with Dommer. With Dommer's permission, MBE entered into a factoring arrangement with the claimant here, BFG. Despite the trust fund status of payments that Dommer would receive on the contract and the trust obligations that MBE would have with respect to payments it received from Dommer, factoring arrangements are permitted under New York law in a carefully circumscribed way set forth in New York Lien Law § 73. Consequently, Dommer entered into direct negotiations with BFG to assist MBE in obtaining the funds it needed to perform the sub-subcontract, and to make sure that to the extent that Dommer would be making payments to BFG rather than MBE, Dommer would not violate the Lien Law.[3]

The only documents which would be signed as between Dommer and BFG would be "Notices of Assignment" of accounts receivable, which would be signed by MBE, BFG, and Dommer, with respect to each progress payment that Dommer would otherwise make to MBE. The "Notices of Assignment" are abbreviated "NOAs" for purposes of this litigation.

The first five NOAs went through without a hitch. Each of those was a single side of one page. Paragraph 1 of each contained the following "boiler plate:" "As of the date hereof the amount owing on the attached invoice by the Undersigned to Assignor, and the amount to be

---

[3]The last is not a finding of fact, but rather a supposition that is open to attack by BFG, if evidence will be taken here, as discussed below.

paid to BFG pursuant to the obligations of the Undersigned is $       . The undersigned represents to BFG that no portion of such sum represents retainage. *Payment condition (sic) upon receipt of payment from Contractor and confirmation of payment to suppliers and prevailing wage supplements."* [Emphasis added.]

   Over $400,000 was disbursed by Dommer to BFG pursuant to those five NOAs.

   The three NOAs at issue here were materially different, though they were not conspicuously distinct from the first five. The statement that payment was conditioned upon "confirmation of payment to suppliers and prevailing wage supplements" was deleted and replaced with the language "Such sum is owed absolutely and the Undersigned now, in the past, or in the future, has or will have no defense to and no right of counterclaim, contra claim, set-off or any other right of deduction from such sum, all of which are hereby waived as to BFG by the Undersigned."

   The first four NOAs were signed by the project manager for Dommer, but not Paul Dommer himself. The last four were signed by Dommer's Comptroller. All eight of the NOAs were drafted by BFG and submitted to the Dommer company. The principal of BFG testified in state court that he never spoke to Paul Dommer about the change in language, but that he did communicate with some unnamed person at Dommer to the effect that BFG would be making the change.[4] Although the Dommer comptroller might not have been called to the stand in state court, she apparently attested in an affidavit that she had been unaware that the language had been

---

[4] Actually, his testimony was not quite that clear. After first testifying that he did speak with Mr. Dommer about the change, he later changed his testimony to make it clear that he had not done so. But he left the impression that he had communicated with someone at Dommer.

changed and did not observe the change when she signed the NOA's that she signed.  She did attest that no-one misled her, as described below.

Before Dommer sent any money to BFG in connection with the three NOAs in question, Dommer received notification that some of MBE's key suppliers were not receiving timely or full payments.

It is not clear to this Court whether decisionmakers in Dommer were aware that they had, in NOA numbers 6, 7 and 8, waived the right (that they had possessed under NOA numbers 1 through 5 and under the sub-subcontract terms between Dommer and MBE), to withhold payments otherwise owed to MBE (or its assignee)) to make sure that the trust fund rights of MBE's suppliers were honored.  But Dommer paid more than $250,000 directly to five major suppliers of MBE and took other steps to assist MBE to complete its work on the sub-subcontract.

In other words, Dommer's actions were consistent with (1) its duty to the general contractor, (2) its need to avoid liability under the payment bond, (3) the terms of NOA members 1 through 5, and (4) its understanding of the New York Lien Law.[5]

However, these actions were in direct violation of the pertinent language of NOA numbers 6, 7 and 8, assuming that those NOA's were binding, as discussed below.

BFG then sued Dommer, Ciminelli, and the Buffalo Public School System for various causes of action including the failure of Dommer to pay to BFG the amounts reflected in

---

[5]See footnote 3 above as to the fact that the last of these statements might still be open to attack, if evidence is to be heard here.

NOA numbers 6, 7 and 8.  At issue here are only the non-final rulings against the Debtor.

        At some time after Dommer made the disbursements to MBE's suppliers and before the state court took the matter under submission, Dommer discovered that BFG had failed to perfect its interest under Lien Law § 73 because BFG had failed to file its factoring agreement in both of the required places.


## THE STATE COURT'S DECISIONS

        First, this Court will address the March 29, 2010 Decision of the state court.  In that Decision, that court held that the fact that BFG failed to perfect its priority as against suppliers of labor and materials (because BFG did not comply with the filing requirement of Lien Law § 73) did not avail Dommer.  Citing substantial case law, the state court stated that "the case law makes clear that the courts have construed the defense of invalidity of an assignment to be available only to the intended beneficiaries of the statute, i.e. laborers and material men . . . ."  The present Court agrees.

        Next, the state court addressed Dommer's argument that it is subrogated to the rights of the trust fund beneficiaries it paid on MBE's behalf.  The state court stated "the key question . . . is whether Dommer Construction is entitled to advantage itself of [the invalidity of the assignment as against Lien Law beneficiaries] through common law subrogation to defend against BFG's breach of contract claims, assuming the contracts are enforceable."  And the state court turned to the latter question first - - the enforceability of NOAs 6 through 8.  That court concluded that the relationship between BFG and Dommer was contractual in nature, and not

statutory, and it rejected Dommer's request that the court consider parol evidence regarding the

terms of the "meeting of the minds" between Dommer and BFG as to the language that was to be

contained in all of the NOAs.  That court instead concluded that

> "There is no dispute that Dommer Construction executed NOAs numbers 6
> through 8 and that they were executed by a properly authorized person.  There
> was no testimony by [Dommer's comptroller] that there was any fraud in the
> factum . . . with respect to the documents or that she was in any way subjected to
> deceptive machinations by BFG with respect to the contents of the documents.  To
> the extent that anyone on behalf of Dommer Construction failed to appreciate the
> change in the language to NOAs numbers 6 through 8, they cannot now be heard
> to complain after they executed the documents and are presumed to know the
> contents thereof.  There can be no doubt that Dommer Construction and its
> principal, Dommer, are experienced in the construction field and cannot
> legitimately assert that they did not understand the significance of the legal
> document Dommer Construction was executing and the obligations it was thereby
> undertaking.

> "The only argument raised by Dommer Construction to avoid the
> application of the clear terms of the contracts (including the 'estoppel language') is
> that it should not be bound by the change in the relevant three . . . NOAs because
> the change in those contracts as to the right of setoff was not brought to its
> attention.  However, a written agreement between sophisticated business people
> cannot be changed based on an assertion that it did not express one party's
> unilateral understanding of it . . . .  The Court therefore concludes that NOAs
> numbers 6 through 8 are enforceable according to their terms, including as to the
> waiver of the right of setoff, and that Dommer Construction has failed to sustain
> any valid affirmative defense negating the enforcement of those contracts."

[Citations omitted.]

Because the present Court disagrees with a <u>different</u> holding by the state court, as

set forth below, and because this Court is ordering further proceedings as a consequence, this

Court will not presently state whether it agrees or disagrees with the above-quoted holding.  The

further proceedings which the present Court orders may or may not lead to an evidentiary

hearing.  If an evidentiary hearing is warranted, the present Court will then decide whether the state court should have accepted Dommer's offer to produce parol evidence regarding a "meeting of the minds."

The state court then addressed what it described as the "key question" which, again, "is whether Dommer Construction is entitled to advantage itself of [BFG's failure to perfect its priority] through common law subrogation to defend against BFG's breach of contract claims."  It concluded that Dommer was not obligated under statute to make payments to MBE's trust fund beneficiaries; and that Dommer's subcontract with MBE afforded Dommer Construction only the *right, but not the obligation*, to pay MBE's contractors.  Thus, the state court ruled that "because its payments were voluntary, . . . Dommer Construction is not entitled to be subrogated to the rights of MBE's trust fund beneficiaries."

For reasons to be set forth below, this Court disagrees with that conclusion.

The state court then acknowledged that that particular holding rested on "unsettled" principles, and considered whether, if Dommer had not *voluntarily* paid and was therefore entitled to subrogation, it could use this right to offset the damages sought by BFG.  That Court then extended another state court's holding - - -  the case of *Matter of Dick's Concrete Company v. K. Hovhamian*, 2008 WL 427 4481;  17 Misc. 3rd 1136 (Sup. Ct. Orange Co. 9/17/2008).  - - - in a way with which the present Court disagrees.  The *Dick's* case, like the present case, involved a factor who failed to perfect its priority properly.   But the plaintiff in the *Dick's* case was a trust fund beneficiary who had actual knowledge of the factoring arrangement.  It was that actual knowledge that defeated the beneficiary's ability to subordinate the unperfected

factoring agreement to its own priority rights.[6]

        The state court in this Dommer case found that "Dommer Construction's actual notice of the assignments, of which it had no knowledge at the time might be invalid as to trust fund beneficiaries under Lien Law § 16, negates its ability to elevate its equitable subrogation rights above the lawful contracts it voluntarily entered into with MBE. . . . This conclusion is supported by the practical observation that any other determination would allow a contractor to evade its contractual obligations to a factor by making payments directly to its subcontractor's trust fund beneficiaries. This would not only impair the contractual relationship between the contractor and the factor, but also between the assignor and assignee. Such an easy means of excusing contractual performance should not be sanctioned by the courts."

        The present Court believes that this holding by the state court misinterprets the *Dick's* case holding, as discussed below. Moreover, the *Dick's* case is not binding.

        On a motion for reconsideration, the state court rendered a second decision, on June 15, 2010. Because of the present Court's disposition of the matter before it, it is not necessary for the present Court to address the contents of that second decision, at this time.

## ANALYSIS

        The governing principle is this:

---

[6]The present Court today incorporates its Bench Ruling that the mere fact MBE's suppliers were receiving payments from BFG does not establish "actual knowledge" that BFG was a factor that could prime the supplier. To a supplier, BFG could have simply been a lender without priority, or an entity that owed money to MBE, or some affiliate of MBE's, etc.

"A party seeking subrogation can establish that its payments were not voluntary either by pointing to a contractual obligation *or to the need to protect its own legal or economic interests.*" 23 N.Y.Jur.2d, Contribution, Indemnity, and Subrogation, § 174. [Emphasis added.]

It is the view of the present Court that the state court made too much of its perceived distinction between Dommer's "right" to pay MBE's debts (such as under the terms of Dommer's sub-subcontract with MBE) and the type of "obligation" to pay those debts that the state court believed was necessary for Dommer to avoid being a mere volunteer.

To be sure, BFG has argued before this Court that Dommer's proper recourse upon learning that some of MBE's suppliers were not being paid was to escrow the funds or to commence an interpleader. Were this a simpler case, this Court would heartily agree. But this was an ongoing construction project and the problem arose before it was completed.

Dommer clearly had an interest to protect in avoiding being defaulted on its contract with Ciminelli; avoiding claims upon its bond, for which it would have to indemnify the surety (and might suffer difficulty thereafter in obtaining bonds for other projects); and in protecting itself from, perhaps, other forms of economic injury such as injury to its reputation or other "fall-out" had MBE's suppliers ceased providing to MBE and had Dommer not stepped in to assist MBE in completing work on the sub-subcontract.[7]

---

[7]The present Court notes that one of the bases for Dommer's motion to reconsider the initial state court decision was the assertion that the issue of whether Dommer was a mere volunteer had never been briefed or argued in the state court. In the decision upon reconsideration the state court stated "it is inaccurate to assert that equitable subrogation principles were not raised prior to the Trial Decision. . . . A subrogation analysis was not a surprise to anyone in this case. In addition, principles of subrogation, as discussed in the Trial Decision, necessarily involved an analysis of the voluntariness of the payments." This writer has great respect for the state court judge, and accepts his explanation. As a matter of personal judicial philosophy, however, this writer would have invited further briefing on

## HOLDING

"Obliged" is too technical a word to use in determining whether one is a mere volunteer.  The term connotes an obligor and an obligee.  But the law, as defined above, is clear that if one acts to protect an interest, one is not a mere volunteer, at least where, as here, the payor itself would have suffered powerful economic damages had it failed to protect its interests.

Dommer was at risk of claims upon the bond (and consequent liability to the bonding company, perhaps risking its future bondability), was at risk of being defaulted on its contract with Ciminelli, and was at risk of general injury to its reputation, which might have threatened its future viability.  Further, it perceived itself to be at risk (rightly or wrongly) of violating its trust fund responsibilities under the Lien Law.[8]

Hence, contrary to the state court's rulings, Dommer was not a mere volunteer. But assuming arguendo that NOAs 6 - 8 were binding, finding that it was not a volunteer  does not mean that Dommer's obligations to BFG were a nullity.  The notion that NOAs 1 through 5 represented a "meeting of the minds," between BFG and Paul Dommer, but that NOAs 6 through 8 did not, seems to lack an evidentiary basis right now.  No evidence has been pointed out to this writer even to suggest that Paul Dommer ever cared a whit about the NOAs that actually were signed for Dommer by others authorized to sign for it, let alone thought them to violate a

the question of "volunteerism," because it arguably was dispositive.

[8]See footnote 3 above.

"meeting of the minds."[9]  Rather it appears that the only reason that Dommer bypassed BFG was

that at about the same time that BFG changed the language, Paul Dommer learned that MBE's

suppliers were not all being paid in full and on time.  That motivated the Debtor to protect itself

against liability as set forth above.  There is no evidence that Paul Dommer looked at the language

of the NOAs, consulted legal counsel, consulted BFG, or made any demand upon BFG.

The Debtor had two competing interests, and it chose to disregard one - - its

contract liability or potential liability to BFG, under contract.  BFG is entitled to damages if

NOA's 6 - 8 are binding.  But BFG's claim that it is entitled to full payment upon NOA's 6

through 8 is absurd.  It is premised on the argument that this Court must assume that every

supplier to MBE (everyone whom Dommer paid) would lose-out as against BFG under the

rationale of the *Dick's* case, so that BFG could have simply kept all the money received on

NOA's 6 through 8 by choosing to "stiff" them all.  If *Dick's* were so extended, then every factor

which realizes that it failed to properly perfect under Lien Law § 73, could simply choose a good

time to give all of the beneficiaries "actual knowledge" of the factoring agreement (presumably by

registered mail), and keep all the trust funds it thereafter receives.[10]  That cannot be the law, and

---

[9]There is evidence that when the Debtor negotiated with BFG to help MBE to borrow from BFG, Paul
Dommer and BFG had discussed the terms of the NOAs that would be used.  Shown an NOA form for a different
project, Paul Dommer wrote that he would "sign a similar letter (sic)."  That form said this, in relevant part: "Such
sum is owed absolutely: Undersigned has no defense to and no right of counterclaim, contraclaim, setoff or any right
of deduction from such sum *which is unrelated to the above mentioned project.  Undersigned and BFG will attain [sic]
certified payrolls, lien releases for suppliers and union requirements for above total before approval of such total.*"
[Emphasis added.] The italicized language did not appear in NOAs 6 - 8.

[10]This Court's interpretation of paragraph 4 of Lien Law § 73 is such that BFG would lose-out to any of
MBE's suppliers who made an appropriate demand for payment against BFG, unless *Dick's* holding is correct and
applies to defeat each such supplier.  (Such a demand would squarely present the *Dick's* issue, because only a supplier
with actual knowledge would make such a demand upon BFG, rather than MBE.)

this Court declines BFG's invitation so to extend the holding in the *Dick's* case.

If NOAs 6 - 8 are enforceable (a matter not yet decided here), BFG has an allowable claim here, but for how much?  At a minimum, it would be lost profits on its deal with MBE, supposing that it had paid all of the MBE suppliers that it was required to pay, and as it presumably would have paid (given its failure to perfect its priority) if all of MBE's suppliers had no actual knowledge of the factoring agreement at any *relevant time*, and if all of MBE's suppliers had made appropriate demand for payment upon BFG under § 73, paragraph 4.  That is the minimum claim allowable here.

The maximum BFG could claim here depends upon this Court's view of a different aspect of the *Dick's* holding.  This Court is of the view that if the *Dick's* decision is correct at all, it is correct as to the *relevant time* for a beneficiary to lose-out under the *Dick's* holding.  It must have gained actual knowledge *before* it supplied labor or materials for a project on which the factor might choose to assert its priority, to the supplier's loss.

BFG argues that Dommer's position to the effect that all of MBE's suppliers would have to have been paid by BFG is "too speculative."  If the state court decisions were correct, then this Court would agree.  However, BFG's proof of claim is the only matter before this Court, and that claim is based solely on the state court's non-final rulings, and this Court has now found that the state court reached the wrong decision as to whether Dommer was or was not a volunteer.

The state court's ruling obviated the need for that court to address the dollar

amount of offsets.  Now, those amounts must be addressed.  The Debtor is entitled to offsets

because it was not a mere volunteer.

CONCLUSION

BFG must amend its claim, without prejudice to its right to appeal today's holding

at an appropriate time.  This is to say that the Rule 3001(f) command that a duly filed proof of

claim enjoys a presumption of validity as to  existence and amount, has been successfully rebutted.

The Proof of Claim had justifiably been premised on the state court's non-final rulings.  Now that

the state court's rulings have been found to suffer an error of law, BFG must resort to the

traditional means of supporting a Proof of Claim, as if the matter had not been decided by the

state court at all.

BFG must examine its own records as to which suppliers to MBE had been given

"actual knowledge" of the factoring arrangement before (and not after) they supplied labor or

materials that Dommer, rather than BFG, paid for.  BFG must also examine its own records as to

whether any suppliers of labor or materials to MBE made any appropriate demand upon BFG

under Lien Law § 73, paragraph 4.[11]  BFG must also provide a copy of the factoring agreement,

in case it provides useful information about its duties to MBE's suppliers.

---

[11]As noted above, the absence of a demand might indicate a supplier who had no actual knowledge of the
factoring arrangement.  The presence of a demand might directly implicate the correctness of the *Dick's* holding.

Proofs of claims that do not enjoy the benefit of being supported by a final state court judgment can be very expensive to prepare. However, the requirements of Title 18 U.S. Code §§ 152 and 3571 require great care.

The burden is on BFG to claim an amount that is a reasonable estimate of the amount it could actually have kept, lawfully, if it had received the trust funds from Dommer and then fulfilled its trust obligations, given the fact that it failed to perfect its priority.

This Court's rulings above as to the maximum extent to which this Court might be persuaded by the holding in the *Dick's* case, gives BFG guidance as to how to undertake the analysis necessary to amend its claim, without prejudice to its ability to appeal today's holding.

Today's holding is also without prejudice to Dommer's right to argue that NOA's 6 - 8 are unenforceable, and to argue that the *Dick's* case has no application at all here.

The parties are encouraged to undertake negotiations that might result in an agreement as to a reduced claim that would not be opposed by the Debtor.

BFG shall so amend its claim within 30 days, or else <u>its</u> claim will be disallowed as being too speculative.

In other proceedings here, BFG, as one holding a claim that has yet to be allowed or disallowed, is vigorously pursuing discovery as to possible avoiding actions as to transfers to the Debtor's insiders. This Court's Orders in that regard are hereby suspended. This is because the Debtor has proffered that if BFG is not actually a creditor, or is a creditor only in a much-reduced amount, the Debtor might have been solvent at all material times. Now having ruled that BFG's claim is not longer entitled to Rule 3001(f)'s presumptions, the Debtor's proffer might be

dispositive of such matters.

This matter is restored to the Court calendar for hearing at the U.S. Bankruptcy Court, Olympic Towers, 300 Pearl Street, Part 1, Buffalo, New York, on March 30, 2011 at 10:00 a.m., for a status report after the amended claim has been filed.

SO ORDERED.

Dated:        Buffalo, New York
              March 3. 2011

s/Michael J. Kaplan

_____
                    U.S.B.J.